IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 311-001 |
| | ) | |
| ERIC R. LOWE | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the government has charged Defendant Eric R. Lowe ("Lowe") with one count of Possession of a Firearm by a Felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. no. 1.) The matter is presently before the Court because Lowe has filed a motion to suppress all "all physical evidence seized by him and . . . all statements made by him" as a result of his encounter with officers from the Dublin City Police Department on December 7, 2010. (Doc. nos. 20, 25.[1]) The government opposes this motion. (Doc. no. 28.) Lowe has submitted an affidavit and a copy of the incident report regarding the October 28th encounter in support of his motion (doc. no. 25, Exs. A & B), and on May 19, 2011, an evidentiary hearing was held, during which the Court heard testimony from Wayne Cain, Chief

---

[1] Lowe filed a preliminary motion to suppress, and, upon prompting from the Court, he filed a particularized motion pursuant to Loc. Crim. R. 12.1. (See doc. nos. 20, 22, 25.) Although the Court's recommendation to deny the request for suppression applies to Lowe's preliminary and particularized motions, for ease of reference, the Court will refer to these two motions as a single motion to suppress.

of the Dublin City Police Department ("Chief Cain"). For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that the motion be **DENIED**.

I.  **FACTS**[2]

On December 7, 2010, Chief Cain was patrolling the Stonewall Street area of Dublin, Georgia – an area where there had recently been numerous reports of residential and vehicle break-ins. (Doc. no. 25, Ex. A; FTR 2:32:36-33:46.[3]) Chief Cain observed Lowe walking down Stonewall Street in the opposite direction that he was driving. (Doc. no. 25, Ex. A; FTR 2:33:47-34:09.) Chief Cain noted that Lowe matched the description of the suspect in the Dublin Police Department's investigation of the recent break-ins. (FTR 2:34:08-34:17.) Chief Cain testified that he noticed Lowe "had a blue tote bag, similar to a fanny pack, that was draped across his shoulders and hanging on his right side."[4] (FTR 2:34:18-34:27.) Also, after they passed each other, Chief Cain observed Lowe repeatedly turn around to see what Chief Cain was doing – behavior that Chief Cain characterized as suspicious. (FTR 2:34:27-34:35.) Chief Cain contacted a nearby officer, Wendell Lawrence, to stop Lowe for identification

---

[2] As noted above, the evidentiary material submitted in conjunction with this motion consists of Chief Cain's testimony, the incident report regarding the encounter, and an affidavit submitted by Lowe. Notably, Lowe's affidavit consists of a two-paragraph document, which, aside from providing general identifying information, merely attests that the brief statement of facts drafted by his counsel in the motion to suppress is "true and correct to the best of [his] knowledge and belief." (Doc. no. 25, Ex. B.)

[3] Although a transcript of the May 19, 2011 hearing has not been prepared, the Court was able to review the proceedings on the Court's recording system, For the Record ("FTR").

[4] Lowe indicates that the bag was not visible because it was underneath a jacket he was wearing that was zipped up. (Doc. no. 25, p. 2.) On cross-examination, Chief Cain reiterated that the bag was in plain sight, not concealed beneath a jacket. (FTR 2:55:03-55:27.)

2

purposes. (FTR 2:34:35-34:52.)

Because Officer Lawrence was only a couple of blocks away, he was able to reach Lowe within a short time period after being contacted by Chief Cain. There is some dispute as to the manner in which Officer Lawrence approached Lowe. Lowe avers that Officer Lawrence approached him, traveling in the opposite direction, and stopped his patrol car "in front of [Lowe] and at an angle . . . , blocking [Lowe's] path and preventing Lowe from proceeding down Stonewall Street." (Doc. no. 25, p. 1.) The government agrees that Officer Lawrence approached Lowe from the opposite direction, but contends that he stopped his car parallel to the street, partially on the street and partially on an adjacent property, and well in front of Lowe. (See doc. no. 25, p. 2; FTR 2:42:47, 3:00:42-02:48.)

In any event, after he came to a stop, Officer Lawrence exited his vehicle and approached Lowe on the street. (Doc. no. 25, pp. 1-2.) Lowe states that he asked Officer Lawrence if there was a problem, to which Officer Lawrence responded that he was investigating thefts in the area and asked Lowe if he knew anything about them. (Id. at 2.) Lowe said that he knew something about the thefts and provided the nickname of the person he claimed was responsible for the thefts. (Id.) Additionally, Lowe states that Officer Lawrence asked Lowe if he had any identification, to which he replied that he that he did not, but provided his name, address, and social security number. (Id.) According to Lowe, Officer Lawrence then told him "to remain there while he radioed [Lowe]'s information in to be checked." (Id.) Officer Lawrence appears to have verified Lowe's identifying information, which revealed that Lowe was reported to be a convicted felon, having been previously

convicted of aggravated assault and drug charges. (See id. at 2 & Ex. A.)

At that time, Chief Cain made his way back to the place where he had seen Lowe. Chief Cain found Lowe and Officer Lawrence talking near the side of the road, and he pulled over his car to the side of the street to speak with them.[5] (FTR 2:35:04.) Lowe immediately recognized Chief Cain and told him who he was; at that point, Chief Cain recognized him as a member of a family with which he was acquainted. (FTR 2:35:08-35:33.) Officer Lawrence advised Chief Cain that Lowe had provided him with information concerning the identity of the individual purportedly responsible for the recent thefts in the area. (FTR 2:35:33-35:47.) Chief Cain then noticed Lowe begin to clutch the bag he was carrying in a manner suggesting either an attempt to conceal the bag or to support the bag's weight. (FTR 2:35:48-36:00.) Chief Cain also noted that there was a bulge in the bag and that the bag appeared to contain a heavy item, which caused it to sag. (Doc. no. 25, Ex. A; FTR 2:36:00-36:07.) Chief Cain asked Lowe what he was carrying in the bag, to which Lowe responded that he had a gun. (FTR 2:36:07-36:13.)

Chief Cain testified that, upon learning that Lowe was carrying a firearm, he asked Lowe to hand the bag to Officer Lawrence. (FTR 2:36:14.) Chief Cain stated that Lowe complied with his request, removing the bag's strap from around his neck and handing the bag to Officer Lawrence, who opened the bag and immediately found a .40 caliber semi-automatic

---

[5]Chief Cain remained in his car throughout the encounter and talked to Lowe through his open driver's side window. (FTR 2:41:13-41:22.)

4

pistol along with a magazine that contained four rounds.[6] (FTR 2:36:16-36:31.) Lowe then told the officers that the firearm belonged to his girlfriend, and that he was merely transporting it from her car to their house, purportedly because their children were going to be in the car later. (Doc. no. 25, p. 2; FTR 2:36:33- 36:49.) Officer Lawrence retained possession of the firearm. (See doc. no. 25, Ex. A.)

Shortly thereafter, two detectives with the Dublin City Police Department arrived on the scene. (FTR 2:36:49-37:01.) At Chief Cain's behest, Lowe repeated to the detectives the information he had previously provided regarding the recent thefts. (FTR 2:37:01-37:08.) Chief Cain testified that one of his detectives recognized Lowe and knew that he was a convicted felon. (FTR 2:37:08-37:14.) According to Chief Cain, that detective asked Lowe if he was a convicted felon, and Lowe responded that he was.[7] (Id.) Chief Cain testified that he told Lowe that, in consideration of the circumstances, he was not going to arrest Lowe at that time and that he was free to continue on his way. (FTR 2:37:14-37:38.) Chief Cain also said that he told Lowe that he would check out the story that Lowe provided about the gun and would contact him later if necessary. (FTR 2:37:14-37:46.) Lowe avers that Chief Cain advised him that if the information he had provided about the thefts proved to be accurate upon further investigation, then Lowe "would not have to worry about any charges as a result of

---

[6]Lowe's account of this portion of the encounter differs slightly from Chief Cain's testimony in that Lowe indicates in his affidavit and motion that he handed the bag to Chief Cain, who opened the bag and found the firearm. (See doc. no. 25, p. 2.)

[7]Again, Lowe's account differs slightly in that he states Chief Cain was the one who asked him if he was a convicted felon. (Doc. no. 25, p. 2.)

5

possessing the gun." (Doc. no. 25, pp. 2-3.) The officers retained possession of the firearm, for which they gave Lowe a receipt, and Lowe walked away in the same direction he had been traveling. (Doc. no. 25, p. 3 & Ex. A; FTR 2:37:48.)

According to Lowe, the encounter lasted about 30 minutes; Chief Cain estimated that it lasted 20 minutes, the majority of which was spent discussing the information Lowe provided about the recent thefts. (Doc. no. 25, p. 3; FTR 2:44:16-44:46.) None of the officers drew their weapons during the encounter or touched Lowe, and Chief Cain testified that Lowe's personal space was not encroached upon during the encounter. (See doc. no. 25, Ex. A; FTR 3:13:01-13:38.)

Chief Cain testified that one of the detectives called Lowe's girlfriend shortly after the encounter to verify Lowe's explanation for carrying the firearm; she did not verify the truth of Lowe's account, and stated to the contrary that the gun had been in their house and that Lowe often carried it while walking.[8] (FTR 2:38:00-38:43.) Additionally, Chief Cain verified that Lowe was a convicted felon by obtaining a report from the Georgia Crime Information Center showing that Lowe had been convicted on an aggravated assault charge and drug charges. (Doc. no. 25, Ex. A.) The next day, Chief Cain obtained warrants to arrest Lowe for possession of a firearm by a convicted felon, possession of a concealed firearm, possession of a firearm within 1000 feet of a school, and possession of a pistol without a license. (FTR 2:40:06-40:31.) Chief Cain arrested Lowe the next day at his residence. (FTR 2:40:32-40:44.)

---

[8]Though not explored in detail at the evidentiary hearing, Chief Cain indicated that the officers also followed up on the information that Lowe provided about the thefts following the encounter. (FTR 2:38:43-39:43.)

6

Lowe was not advised of his Miranda rights during the December 7th encounter or when he was arrested on December 8th. (FTR 2:40:44-40:50.) Chief Cain testified that Lowe was not questioned following the December 8th arrest. (FTR 2:40:50-41:05.)

## II. DISCUSSION

### A. Credibility

Because of the factual conflicts between Chief Cain's testimony and the account of the December 7th encounter presented in Lowe's motion and affidavit, the Court must first address the threshold issue of credibility. Credibility determinations "are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citations omitted).

Here, the Court credits the account given by Chief Cain as to what transpired during the December 7, 2010 encounter. Chief Cain provided his account through live testimony at the evidentiary hearing and was subjected to cross-examination. Chief Cain gave a detailed account of the encounter, including the verbal exchange between Lowe and the officers, as well the surrounding circumstances. Chief Cain's testimony was consistent and free of

self-contradiction. In contrast, Lowe presented his account of the encounter in an untested affidavit that merely incorporates by reference the brief statement of facts provided in his motion to suppress. (See doc. no. 25, Ex. B.)

Although the accounts of the encounter provided by Lowe and Chief Cain are materially similar in many respects, the Court's credibility determination is relevant to the Court's findings regarding the visibility of the bag Lowe was carrying, the position of Officer Lawrence's vehicle relative to Lowe, and the duration of the encounter.

**B.     Suppression Is Not Warranted Under the Fourth Amendment**

Lowe asserts that the December 7, 2010 encounter was an impermissible investigatory seizure under the Fourth Amendment because it was not supported by reasonable suspicion; he argues that all the physical evidence seized and statements made as a result of the encounter should therefore be suppressed. (See generally doc. no. 25.) The government contends that the initial portion of the December 7th encounter was consensual and argues that, even if Lowe was seized, such seizure did not occur until the officers searched Lowe's bag and confiscated his gun, at which point they reasonably suspected him of criminal activity. (See generally doc. no. 25.)

Where a party moves for the suppression of evidence, the movant bears the initial burden of showing that he was subjected to a search or seizure and that the evidence in question should be suppressed; in the context of a warrantless search or seizure, the burden then shifts to the government to show that the encounter was consensual or that the search or

seizure was justified. See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977)[9]; United States v. Beckham, 505 F.2d 1316, 1318 (5th Cir. 1975). As correctly noted by both parties in their respective briefs, police-citizen encounters generally fall within one of three categories: (1) exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; or (3) full-scale arrests. United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006).

> Regarding the first category, it is well-established that:
>
> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage – provided they do not induce cooperation by cooercive means.

Id. at 777-78 (citing United States v. Drayton, 536 U.S. 194, 200-01 (2002)); see also Florida v. Bostick, 501 U.S. 429, 434 (1991) ("[M]ere police questioning does not constitute a seizure."). For the purposes of Fourth Amendment analysis, a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). A person is not "seized" if "a reasonable person would feel free to terminate the encounter" with the police. Miller v. Harget, 458 F.3d 1251, 1257 (11th Cir. 2006). Factors identified as relevant to this "free to leave" inquiry include, *inter alia*, whether a citizen's path is blocked or impeded, the display

---

[9]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

of weapons, any physical touching of the suspect, and the language and tone of voice used by the police. Id. A seizure also occurs if the subject yields to an officer's show of authority; however, a show of authority to which the subject refuses to yield does not amount to a seizure. California v. Hodari D, 499 U.S. 621, 625-26 (1991).

Once the interaction rises to the level of a brief seizure or investigatory detention, then the officer must have reasonable, articulable suspicion that the individual has engaged in or is about to engage in criminal activity. Terry, 392 U.S. at 24; United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990) ("[E]ven in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity.") Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop. Terry, 392 U.S. at 21; see also United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007); see also United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004). Furthermore, "[a]n officer who has a reasonable suspicion that an individual is engaged in illegal activity and is armed with a concealed weapon is justified in conducting a limited search for weapons." United States v. Hunter, 291 F.3d 1302, 1307 (11th Cir. 2002).

10

Here, the Court finds that the initial portion of the December 7th encounter was the type of consensual, non-coercive encounter that requires no justification under the Fourth Amendment. During that part of the encounter, Officer Lawrence, acting pursuant to an instruction from Chief Cain, merely approached Lowe, explained that police were in the area because of recent thefts, and asked for identification. (Doc. no. 25, pp. 1-2 & Ex. A.) The Court finds that Officer Lawrence did not block or impede Lowe's path with his vehicle. On the contrary, he parked his car well in front of Lowe. (FTR 2:42:47, 3:00:42-02:48.) There is nothing unusual about an officer parking his car on the side of the street, or parking partly on an adjacent property when there is no shoulder or sidewalk and the officer does not want to park in the middle of a residential street. In addition, Chief Cain testified that, had Lowe chosen to go about his business, he could easily have continued on his way simply by walking in any direction except directly into Officer Lawrence's parked car, including walking around either side of the car. (Id.) Accordingly, the Court rejects Lowe's contention that Officer Lawrence's vehicle impeded his path in a manner suggesting a Fourth Amendment seizure.

The only other occurrence possibly suggesting that Lowe was seized during the initial portion of the encounter is the fact that, according to Lowe, after he voluntarily provided his identifying information, Officer Lawrence told him "to remain there while he radioed [Lowe]'s information in to be checked." (Doc. no. 25, p. 2.) The Court finds that this fact does not weigh significantly in favor of finding that Lowe was seized for Fourth Amendment purposes. While the fact is not specifically contested by the government, Lowe has not specifically addressed its import in his motion. Moreover, Lowe's characterization of Officer Lawrence's

11

statement indicates that it was a casual request to wait for a moment while he checked his identifying information, rather than any sort of authoritative command to "stay put." Cf. United States v. Johnson, 620 F.3d 685, 691 (6th Cir. 2010) (finding defendant was seized where two officers loudly announced themselves as police several times and "yelled at [defendant] to 'stop' and 'stay right there where he was' as they advanced toward him in the dead of night"). Also, there is no indication that Officer Lawrence used a "tone of voice indicating that compliance with his request might be compelled." United States v. Mendenhall, 446 U.S. 544, 554 (1980) (cataloging "[e]xamples of circumstances that might indicate a seizure"). Furthermore, Officer Lawrence's overall course of conduct during the initial portion of the encounter – which consisted of approaching Lowe in a public place, asking for identification, and posing questions about recent criminal activity in the area – has explicitly been identified as non-coercive and insufficient to establish a Fourth Amendment seizure. See Perez, 443 F.3d at 777 ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street . . . and putting questions to them . . . . Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions [and] ask for identification . . . ."). Accordingly, the Court concludes that, under the totality of the circumstances, the initial part of the encounter was the type of non-coercive interaction that is not protected by the Fourth Amendment.

Following the initial brief interaction between Officer Lawrence and Lowe, Chief Cain returned to the scene and, after noting the unusual manner in which Lowe was clutching the

bag draped across his shoulder, along with the bulge in the bag and the appearance of a heavy object, asked Lowe what was in the bag. (Doc. no. 25, Ex. A; FTR 2:35:48-36:13.) When Lowe replied that he had a gun, Chief Cain asked him to pass the bag to Officer Lawrence, who promptly opened the bag and found the .40 caliber semi-automatic pistol and ammunition. (FTR 2:36:14-36:31.) As the government correctly argues, this was the earliest point at which Lowe was seized for Fourth Amendment purposes.[10] See Hodari D, 499 U.S. at 625-26 (holding that seizure occurs when subject submits to show of authority by officers). Accordingly, everything the deputies had observed prior to that point may provide a basis for reasonable suspicion. See United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) ("Officers can consider everything that happened up to [the point of seizure] to establish reasonable suspicion."). Here, Chief Cain had noted Lowe's nervous reaction when they passed each other, Lowe's resemblance to the description of the suspect in the investigation of the recent thefts,[11] and Lowe's presence in the area where the thefts had occurred.[12]

---

[10]Although Lowe may have been seized at this point by submitting to Chief Cain's request to give his bag to Officer Lawrence, it is also conceivable that such interaction amounted to nothing more than Lowe consenting to a search of his bag, which would likely lead to a finding that Lowe was not seized at all during the December 7th encounter. However, the government has the burden of showing that such consent is voluntary. See United States v. Jordan, 635 F.3d 1181, 1186 (11th Cir. 2011). Rather than attempt to meet this burden, the government chooses to assume, for the sake of argument, that Lowe was seized at this point, and asserts that the seizure was supported by reasonable suspicion. Because the Court finds this argument persuasive, as explained infra, it need not make any definitive finding on the issue of whether Lowe's compliance with Chief Cain's request to hand over his bag was consenting to a search or submitting to a show of authority.

[11]An individual's resemblance to a description of a person suspected of criminal activity has been identified as relevant to the reasonable suspicion inquiry. See United States v. Marcelino, 736 F. Supp. 2d 1343, 1349 (N.D. Ga. 2010) (citing United States v. Martin, 28

Additionally, he had observed that Lowe's bag, which had a suspicious bulge and which Lowe eventually told him contained a firearm. Under such circumstances, the Court readily concludes the officers reasonably suspected illegal activity and were entitled to conduct a limited search for weapons. See Hunter, 291 F.3d at 1307.

In sum, the Court finds that the initial portion of the December 7, 2010 encounter was non-coercive and did not need to be supported by reasonable suspicion. The Court further finds that at the earliest point at which Lowe was seized, the officers had reasonable suspicion such that they did not violate his Fourth Amendment rights.

### C. Suppression Is Not Warranted Under Miranda

Lowe also contends that the statements he made during his "illegal detention" should be suppressed on the basis that they were made without being advised of his Miranda rights. (Doc. no. 25, p. 4.) Lowe's Miranda claim is set forth in a conclusory fashion; rather than identifying any specific circumstances indicative of Miranda custody or pointing to statements made in response to custodial interrogation, Lowe simply asserts that he "was questioned by these officers and made several incriminating statements without being advised of his Miranda rights . . . ." (Id.) The government concedes that Lowe was not advised of his Miranda rights during the December 7th encounter, or in conjunction with his arrest the following day, but argues that he "was never subjected to a custodial interrogation that would call for the police

---

F.3d 742, 744-45 (8th Cir. 1994)).

[12]A suspect's presence in an area of expected criminal activity has likewise been identified as relevant to the reasonable suspicion inquiry, though not sufficient by itself to justify seizure. United States v. Gordon, 231 F.3d 750, 756 (11th Cir. 2000).

14

to inform him of his Miranda rights." (Doc. no. 28, p. 6.)

Under Miranda v. Arizona, prior to conducting a custodial interrogation, law enforcement officers must warn the interview subject that he has a "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966). To be entitled to the protections established in Miranda, a suspect must be in custody. Id. at 447; United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) ("[P]re-custodial questioning does not require Miranda warnings."). The party moving for suppression has the burden of showing that he was in custody at the time the statements in question were made. de la Fuente, 548 F.2d at 533. A person is in custody for Miranda purposes if he has been subjected to "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Maryland v. Shatzer, ___ U.S. ___, 130 S. Ct. 1213, 1224 (2010); United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010). For a suspect to be in Miranda custody, a court must determine that, "under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001) (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)) (punctuation omitted). However, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Shatzer, 130 S. Ct. at 1224. In addition to this restriction on movement, for a person to be in Miranda custody, the circumstances must "exert upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination

15

to require that he be warned of his constitutional rights." United States v. Acosta, 363 F.3d 1141, 1148-49 (11th Cir. 2004) (quoting Berkemer, 468 U.S. at 437); see also Shatzer, 130 S. Ct. at 1224-25.

Furthermore, "[t]he test [for determining whether a suspect was in custody] is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (quoting Moya, 74 F.3d at 1119). Rather, "[t]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). Accordingly, "courts must examine all of the circumstances surrounding the interrogation[13] and determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." Lall, 607 F.3d at 1284 (quoting Yarborough v. Alvarado, 541 U.S. 652, 662 (2004)). Furthermore, the "reasonable person" in a Miranda custody analysis "is defined as a reasonable innocent person." United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (quoting Moya, 74 F.3d at 1119).

Turning to the instant motion, it is undisputed that Lowe was not subjected to a formal arrest during the December 7th encounter. The Court finds that Lowe was also not subjected to "a restraint on freedom of movement of the degree associated with formal arrest." Shatzer,

---

[13]Circumstances that have traditionally received consideration include "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location and length of the detention." Luna-Encinas, 603 F.3d at 881 (quoting Street, 472 F.3d at 1309) (quotation marks and internal citations omitted).

130 S. Ct. at 1224. Although the confiscation of Lowe's firearm is somewhat suggestive of custody, it is apparent in light of the totality of the circumstances that Lowe was not in custody for Miranda purposes during the December 7th encounter. The officers never brandished their weapons, or touched Lowe during the encounter, which took place at a neutral, public location. See Luna-Encinas, 603 F.3d at 882 (explaining that courts should be "much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings . . . ." (quoting Brown, 441 F.3d at 1348)). Moreover, as noted above, there is no indication that either officer used language or a tone suggesting that Lowe might be compelled to comply with their requests. See supra Part II.B. One of the officers – Chief Cain – never exited his vehicle during the encounter. Furthermore, at a duration of 20 minutes, the encounter did not last exceptionally long, and the majority of that time was spent discussing information that Lowe voluntarily provided regarding the recent thefts in the area. (FTR 2:44:16-44:46.) Finally, of particular importance is the fact that Chief Cain at one point told Lowe that he was free to go about his business, and at the termination of the encounter Lowe did just that. (FTR 2:37:14-37:48.) Therefore, the Court finds that Lowe's freedom of movement was not restricted to the degree necessary for Miranda custody.

Moreover, even if Lowe's movement were sufficiently restricted, the Court would nevertheless find that he was not in Miranda custody because the circumstances surrounding the encounter did not exert upon him pressures that impaired the free exercise of his privilege against self-incrimination to an extent that required that he be given Miranda warnings. See Acosta, 363 F.3d at 1148-49. Rather, the relevant circumstances identified above are

indicative of a non-coercive interaction; the fact that such interaction happened to result in the discovery of information that eventually led to his arrest does not mean that he was "subjected to restraints comparable to those associated with a formal arrest." See id. at 1149. The Court therefore finds that Lowe was not in custody for Miranda purposes during the December 7th encounter.

Finally, it is uncontested that Lowe was subjected to a formal arrest on December 8, 2010, and that Lowe was not advised of his Miranda rights in conjunction with that arrest. However, Lowe has not alleged that he was subjected to any form of interrogation following his arrest, and has identified no statements made after his formal arrest. Moreover, Chief Cain provided unequivocal testimony that Lowe was not subjected to any questioning in conjunction with or subsequent to his December 8th arrest. Accordingly, Lowe's Miranda claim is without merit and provides no basis for the suppression sought in the instant motion.

### III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Lowe's motion to suppress be **DENIED**. (Doc. nos. 20, 25)

SO REPORTED and RECOMMENDED on this 16th day of June, 2011, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE